UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

PAUL-ANTHONY MAGADIA

Plaintiff,

against

JANET A. NAPOLITANO, United States
Department of Homeland Security,

Defendant.

———————————————————————— x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __2/26/09__

06 Civ. 14386 (CM)

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMahon, J.

### Introduction

Plaintiff, Paul-Anthony Magadia ("Magadia") is a former Asylum Officer ("AO")

with the Immigration and Naturalization Service ("INS" or "USCIS").[1] He brings this

action exclusively pursuant to Title VII of the Civil Rights Act of 1991, 42 U.S.C. §§

2000e et seq. (as amended) ("Title VII") against defendant Janet A. Napolitano, Secretary

of the Department of Homeland Security (or "Government"). He claims that the

Government, by and through its managers and supervisors acting within the scope of their

employment: 1) discriminated against him based on his race, Asian-American (Filipino);

2) created a hostile work environment based on his race; 3) constructively terminated

_____

[1] As of March 1, 2003, the United States Citizenship and Immigration Services
("USCIS") of the Department of Homeland Security ("DHS") replaced the INS with
respect to the granting of immigration benefits. The terms USCIS and INS are used
interchangeably in this decision.

1

him; and 4) retaliated against him based on his complaints to the Federal Bureau of Investigation ("FBI") and Office of the Inspector General ("OIG"), his union grievance activity, and the filing of his administrative complaint ("EEO complaint) with Equal Employment Office ("EEO").

The discriminatory and/or retaliatory conduct of which he complains include: 1) his supervisors and managers accusing him of wrongdoing and disloyalty in connection with the Shandorf investigation; 2) being given an overall "unacceptable" performance rating for the 1998-1999 rating period; 3) having the processing of his within-grade step increase in salary delayed; 4) being temporarily denied access to certain computer programs used by AOs at the NYAO; 5) being temporarily assigned to AO duties outside of the NYAO; 6) not being selected for two supervisor positions to which he applied in 1999 and 2000; and 7) a being given the option of receiving a 14-day suspension for not adhering to NYAO policy or signing an abeyance agreement, which allegedly forced Magadia to resign. The plaintiff also asserts he received a negative job recommendation from his supervisors at INS after he filed his EEO complaint with the EEO.

The Government now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.

For the following reasons, the Government's motion is granted.

## I.    Rule 56.1 Statements

The Court begins by noting that plaintiff has failed to comply with Local Rule 56.1. The purpose of the rule is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties. See Monahan v. New York City Dep't of Corr., 214

2

F.3d 275, 292 (2d Cir. 2000); Watt v. New York Botanical Garden, 2000 WL 193626, at

*1 n.1 (S.D.N.Y. Feb. 16, 2000). To that end, the plaintiff's obligation under Local Rule

56.1(b) in responding to a defendant's statement under Local Rule 56.1(a) is clear:

> The papers opposing a motion for summary judgment shall include a
> correspondingly numbered paragraph responding to each numbered paragraph in
> the statement of the moving party . . . .

To the extent that the plaintiff disputes any of defendant's statement of material

facts pursuant to Local Rule 56.1(b), Local Rule 56.1(d) requires him to support his

denial by citing to admissible evidence as required by Federal Rule of Civil Procedure

56(e). See Local Rule 56.1(d). Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is properly made and supported, an
> opposing party may not rely merely on allegations or denials in its own
> pleading; rather, its response must—by affidavits or as otherwise provided
> in this rule—set out specific facts showing a genuine issue for trial. If the
> opposing party does not so respond, summary judgment should, if
> appropriate, be entered against that party.

In this Circuit, "where there are no citations or where the cited materials do not

support the factual assertions in the Statements, the court is free to disregard the

assertion." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir.2001) (citations and

internal punctuation omitted); see also O'Keefe v. Arbon Equip. Corp., 399 F. Supp. 2d

478, 482-83 (S.D.N.Y. 2005).

Here, plaintiff's Rule 56.1 statement did not contain a single citation to evidence

for paragraphs 9, 12, 22, 23, 30, 32, 40, 44, 45, 51. As a result, the corresponding facts in

these paragraphs in the Government's Rule 56.1 statement are deemed admitted

## II.     Factual Background

The following facts—drawn from the Government's Rule 56.1 statement—are deemed undisputed, unless otherwise noted; where the facts are disputed, they are viewed more favorably to the plaintiff, the non-moving party.

### A.     Plaintiff's Employment with the New York Asylum Office

Magadia worked as an AO for the INS at its New York Asylum Office ("NYAO") located in Rosedale, New York, from September 3, 1996 until June 7, 2001, when he resigned.

As an AO, Magadia's duties included, *inter alia*, interviewing aliens who applied for asylum and adjudicating their applications. AO's had the authority to grant asylum, subject to the approval of a Supervisory Asylum Officer ("SAO"), but could not deny asylum. Rather, where the AO believed that an alien did not qualify for a grant of asylum, he referred the alien to deportation proceedings before an Immigration Judge ("IJ") pursuant to the issuance of a Notice to Appear ("NTA"), where the alien may renew his asylum application. An AO's recommendation in a given case is summarized in an "Assessment Memo."

### B.     The Criminal Investigation and Arrest of Magadia's Supervisor

Magadia testified that he did not have any employment related problems at the NYAO prior to the arrest of his supervisor, John Shandorf ("Shandorf") in April 1999, and that all of his causes of action arose as a direct result of that arrest and the related governmental investigations. He contends that, following Shandorf's arrest, he was forced to work in a hostile work environment, became a target of discrimination and retaliation, and ultimately was forced to resign.

4

In or about April 1997, Magadia was assigned to work under the supervision of Shandorf, an SAO. This meant that Magadia submitted his asylum recommendations to Shandorf for his review and approval. (Menges Decl. ¶ 8.)

Around this time, the FBI and OIG began investigating Shandorf on suspicion that he had been taking bribes from Albanian asylum applicants in return for grants of asylum. As part of this bribery scheme, Shandorf instructed certain AOs under his supervision to either enter grants of asylum in the first instance, or to change a referral to an IJ to a grant of asylum.

Only three people at the NYAO knew of this investigation at the time: Patricia Trubiano, the NYAO Director; Patricia Jackson[2] ("Jackson"), the NYAO District Director; and SAO Alan Simek ("Simek").

In or about April 1998, as the investigation of Shandorf continued, Magadia talked to Simek about a disagreement he had with Shandorf about the disposition of an asylum application involving an Albanian. The plaintiff contends that he went to Simek to talk about his concerns in this case because, at the time, Simek was a close friend. Magadia did not know about the Shandorf investigation. When he approached Simek, and Simek told him to follow NYAO policy and report his concerns to the Deputy Director or Director. Pursuant to NYAO policy, where an AO and a SAO disagreed as to the disposition of an asylum application, the matter had to be elevated up the chain of command to the Deputy Director or Director.

---

[2] Patricia Jackson is now known as Patricia Menges. At all times relevant to this case, Menges held the position of either Deputy Director or Director to the NYAO, and was known by her maiden name Patricia Jackson. The Court refers to Menges by her maiden name.

5

In this instance, Magadia did not follow NYAO policy, because he wanted to avoid conflict with Shandorf. However, Magadia swears that, on at least two occasions during this time period, he followed the NYAO policy by asking Shandorf to elevate the dispute to the Director. (Pl. Ex. A ¶¶ 18-20.) Magadia never went directly to the Deputy Director or Director, which is what Simek had told him to do.

The investigation into Shandorf's activities concluded with his arrest on April 8, 1999. He was charged with, and ultimately convicted of, several counts of bribery of a public official and conspiracy to defraud the United States, for which he received a 21 month sentence.

### C.   The FBI's, OIG's, and OIA's Investigation of Magadia

At the time of Shandorf's arrest, the FBI and OIG examined the files of his AOs to assess the nature of the bribery scheme and to determine whether any of the AOs under his supervision were culpable. To this end, the FBI and OIG removed the files of all of his AOs, including Magadia. The files of two of Shandorf's AOs—Magadia and Anthony Cannizaro ("Cannizaro"), a white male—contained more changes of asylum recommendations than the files of any other Shandorf AO. Therefore, the investigators increased the focus of their inquiry on Magadia and Cannizaro, and interviewed them on several occasions.

As part of the investigation, Magadia gave investigators a yellow hard-cover logbook in which he kept track of the cases he had adjudicated. The logbook indicated whether he had changed the outcome of a case at Shandorf's request. Magadia also admitted to the investigators that he had been suspicious of Shandorf's partiality toward Albanian asylum applicants, and recalled that on approximately ten occasions—later

revised to five—he had changed the outcome of an adjudication from a "referral" to an IJ, to a "grant of asylum," based solely on Shandorf's instruction.

As a result of the post-arrest investigation, the FBI and OIG cleared Magadia of any criminal wrongdoing. However, the evidence that they uncovered caused the INS Office of Internal Audit ("OIA") to investigate whether Magadia engaged in any misconduct short of a crime. As a result of the OIA investigation, Magadia had to testify under oath in December 1999. Magadia testified that he did not know of Shandorf's criminal scheme.

On or about July 13, 1999, while the investigation was pending, certain AO duties were taken away from Magadia, and from all other AOs who reported to Shandorf. Magadia and the other Shandorf AOs were also denied access to a particular computer program, which they had used to alter results in the Albanian cases at Shandorf's direction.

As part of the post-arrest investigation into Shandorf's criminal activities, the NYAO temporarily assigned Magadia to tasks outside of its office until it could be determined whether he had committed any wrongdoing. Among other tasks, Magadia was temporarily assigned to the Asylum Pre-Screening Officer ("APSO") program, where he conducted "credible fear" interviews of asylum-seeking aliens who were detained at the Wackenhut Detention Facility. This temporary assignment did not strip Magadia of his duties as an AO; in fact, only a certified AO who has held the position for at least one year can conduct "credible fear" interviews. However, it was a deviation from his normal duties.

Once the FBI, OIG, and OIA had completed their investigations and cleared him, Magadia resumed his former duties and privileges.

## D.    The Allegations Underlying Plaintiff's Complaint

### 1.    Magadia's 1998-99 Performance Appraisal, Union Grievance, and Within-Grade Step Pay Increase

Shandorf's AOs needed to be reassigned after his arrest. Magadia was assigned to Simek, who also served as Magadia's Rating Official for the rating period beginning April 1, 1998, and ending March 31, 1999.

The 1998-99 performance appraisal rating period closed, which was shortly before Shandorf's arrest, before Simek became Magadia's SAO and Rating Official. Shandorf had not prepared Magadia's formal evaluation before he was arrested (Simek Decl. ¶ 13), and what was available—Shandorf's initial assessment of Magadia's performance—was deemed questionable by virtue of Shandorf's criminal conduct and the potential complicity of his AOs in his criminal scheme. Consequently, Jackson asked Simek to review Magadia's work performance for an additional 90 days—from April 12, 1999, to July 13, 1999. Although the 1998-1999 rating period was technically closed, Simek's 90 day assessment was credited towards it. Magadia received his 1998-99 performance appraisal on August 19, 1999.

Simek gave Magadia an overall "unacceptable" performance rating for the 1998-99 rating period. The Performance Appraisal Form for AOs contains six ratings: five critical elements and one non-critical element. Simek gave Magadia an "unacceptable" rating for the "Prepares Written Assessment" critical element. Magadia also received an "unacceptable" rating for the non-critical element "Adheres to Standards of Conduct."

8

Because Magadia received an "unacceptable" rating for one of the critical rating elements, his overall performance appraisal rating was "unacceptable."

Simek purportedly gave Magadia an "unacceptable" rating for the "Prepares Written Assessment" critical element because, during the 90-day additional rating period, Simek had to return a total of twenty-two assessment memoranda to Magadia due to significant inadequacies in factual analysis, legal reasoning, and/or credibility findings. For example, Simek contends that Magadia's assessment memorandum frequently erred in applying the one-year rule, which requires an asylum applicant to establish that he entered the United States within one year of applying for asylum in order to be statutorily eligible for such relief. Simek testified that Magadia's error—stipulating to dates of entry that could not be confirmed—was "simply sloppy," and "could have prejudiced if not precluded the Government from asserting the one-year bar in subsequent deportation proceedings." (Id. ¶ 15.)

Simek gave Magadia an "unacceptable" rating for the non-critical element "Adheres to Standards of Conduct" because Magadia failed to follow the NYAO policy for resolving AO and SAO disagreements about the outcome of an asylum application. Simek faulted Magadia for continuing to enter asylum grants at Shandorf's insistence even though he disagreed with the outcome, and for failing to heed Simek's instruction that Magadia should speak to the Deputy Director or Director about his disagreements with Shandorf.

Magadia contends that this performance evaluation was "trumped up," and that there was "no need for me to get an unacceptable rating." (McNeela Decl. Ex. B at 168:14-15.) He argues that his assessment memoranda were adequate in factual analysis,

9

legal reasoning, and credibility findings. Prior to Simek's review, Magadia asserts that he never received an unacceptable rating from any of his supervisors. (See Pl. Opp'n Ex. A. ¶ 9.)

Magadia also argues that he should not have received an "unacceptable" rating for the non-critical element. He asserts that he followed NYAO policy about reporting disagreements, and offers evidence from a current SAO, Yuniya Van Gronigen ("Van Gronigen"), who testified that the NYAO policy is "inherently flawed" because it is impossible for an individual AO to know if the SAO elevated the dispute to the Director. (Id. ¶ 18-19.)

Magadia believes Simek gave him a false and negative evaluation for 1998-99 because Jackson told him to do so. Magadia testified that another AO, Patty Bethea, overheard Simek say, "I will write the worst possible performance appraisal for Paul Anthony. . . . Paul Anthony does not know how to analyze cases." (Id. at 171:19-23.) The plaintiff does not explain how this implicates Jackson.

Magadia further argues that he received the negative evaluation in retaliation for the complaints he purportedly lodged with the FBI, OIG, and OIA during the course of their post-arrest investigations, and in retaliation for filing a union grievance. However, Magadia does not specifically recall when he made such complaints, nor does he recall their substance.

Magadia filed a union grievance contesting his performance review on September 15, 1999. Magadia filed the grievance not just to have his negative performance appraisal rescinded, but to have certain "penalties" (change of duties and access to certain computer programs) be remitted. These aspects of his job had been temporarily

suspended while the criminal investigation proceeded; all AOs supervised by Shandorf were similarly treated.  (Menges Decl. ¶ 13; see McNeela Decl. Ex. I at 2-3.)

Initially, the NYAO denied Magadia's grievance, that decision was appealed to John Landolis ("Landolis"), the Director of the INS' Asylum Division.  After reviewing the grievance, Landolis ordered that Magadia's overall "unacceptable" performance rating be rescinded.  Instead, he ordered that Magadia receive an interim rating of "unacceptable."  During this interim period, NYAO management was required to assist Magadia in improving his "unacceptable" performance.  After the interim period expired, Magadia would be given a new, final rating.

Landolis denied Magadia's request to have the penalties remitted, because Magadia was still under investigation: "Due to the continuing criminal investigation of which Mr. Magadia is a part of, reassuming formal Asylum Officer responsibilities is out of the question because of the sensitive nature of the job and the required access to INS computer systems."  (McNeela Decl. Ex. I at 2-3.)

Finally, Landolis ruled that, because Magadia's overall "unacceptable" rating had been rescinded, the denial of Magadia's within-grade step pay increase would also be rescinded.  Instead, the final decision on whether to grant Magadia a within-grade step pay increase would be postponed "until there is a rating of record."  (Id. at 3.)

Eventually—the record does not make clear when—Magadia was deemed eligible for a within-grade step pay increase.  However, there was some delay in processing it.  Magadia testified that it took a "couple months" for him to receive the pay increase after Landolis issued the ruling in December 1999.  (McNeela Decl. Ex. B. 203:9-206:14.)  Magadia believed that Jackson delayed the processing because of his race, specifically

11

because "Ms. Jackson and Mr. Simek, they are both white. And you know they have

been pretty much persecuting me since this Shandorf incident. And this was their

opportunity to take advantage of the situation to constructively have me terminated or

removed from the office based on my ethnicity as an Asian American." (Id. at 217:6-14.)

The Government denied any such motivation, noting that Jackson did not ever have a role

in processing Magadia's within-step increase, because such pay increases are processed

by the USCIS Regional Administrative Office in Vermont, not the NYAO. Magadia,

however, contends that Jackson "played an important, critical, and major role in the

process . . . [because] she was the only one who had the authority to approve, sign, and

submit the required paperwork before the USCIS Regional Administrative Office in

Vermont." (Pl. Opp'n at 18.) He argues that "without [Jackson's] signature, the USCIS

. . . would not be able to commence processing the paperwork." (Id.)

### 2. The Denial of Computer Access and Temporary Detail

As noted above, it took longer for the FBI and OIG to clear Magadia and another

AO, Cannizaro, of wrongdoing, because they had altered more of their asylum

determination at the request of Shandorf than any of the other AOs within Shandorf's

supervision. Because of the alterations, they were subjected to greater scrutiny by the

FBI, OIG, and eventually, by the OIA, which delayed resumption of their computer

access and Magadia's return to his former duties (rather than working at APSO).

However, the plaintiff was eventually restored to his former duties and got his computer

privileges back. This occurred no later than the end of 2000, although the exact date is

not clear from the record. (See McNeela Decl. Ex. B. 209:3-211:15.)

### 3.    Subsequent Accusations of Wrongdoing and Disloyalty

After Shandorf's arrest, Magadia contends that Simek and Jackson accused him of complicity in Shandorf's illegal activities and of being disloyal to the NYAO. Magadia testified that Simek said, "Because [you] worked with Shandorf [you] might know something about Shandorf's activities . . . If [you] knew something about it [you] should tell him." (McNeela Decl. Ex. B at 152:3-6.) Magadia characterizes these remarks as accusations of disloyalty and wrongdoing. He asserts that Simek made remarks like these sporadically and with decreasing frequency during the course of the FBI's and OIG's post-arrest investigation of Shandorf's AOs, which lasted from 1999 to 2000. Magadia does not contend that Simek made any other type of remarks accusing him of disloyalty and wrongdoing. Magadia testified that Simek did not threaten him, or accuse him of taking bribes or of committing any crime. Magadia also testified that he did not believe that Simek's comments were motivated by race or were retaliatory.

Magadia contends that, during an April 2, 2001 meeting, Jackson flatly accused him of being aware of Shandorf's criminal scheme and said that the plaintiff could not be trusted. Magadia contends that Jackson's accusations were racially motivated because they were "part of her scheme to harass me into giving information I don't know anything about." (Id. at 163:15-17.) He admits, however, that he does not have any evidence to support this contention. (Id. at 163:18-22.)

Magadia attended the April 2, 2001 meeting, accompanied by his union representatives, Richard King and Kevin Love, in order to discuss inconsistencies between the FBI's and OIA's reports of what he told investigators. Magadia contends

13

that, during the meeting, Jackson "pretty much played like the bad cop trying to accuse of [sic] you doing something." (Id. at 157:21-23.)

### 4. Denial of Magadia's Applications for District Adjudications Officer and SAO

In 1999, Magadia applied for the position of District Adjudications Officer ("DAO") at the New York District Office. He contends that Jackson discriminated against him by giving him a negative recommendation. He also claims that Jackson denied his 2000 application for the position of SAO at the NYAO for discriminatory reasons. Magadia was not selected for either of these positions; he received notices informing him of such on October 20, 1999, and September 27, 2000, respectively.

#### a. DAO

On or about August 18, 1999, Magadia interviewed for a DAO position at the New York District Office. (McNeela Decl. Ex. B at 131:20.) The New York District Office is wholly separate from the NYAO, and has a separate chain of command. Edward J. McElroy ("McElroy"), the Director of the New York District Office, interviewed Magadia for the DAO position.

Magadia contends that Jackson became upset with him for interviewing for the job. He asserts that Jackson must have given him a negative recommendation during a telephone conversation with McElroy because, "I wasn't hired. I wasn't offered a position as the supervisory district adjudication officer of Garden City." (Id. at 134:12-14.) However, Magadia does not offer any evidence to show that Jackson and McElroy had a phone conversation about him.

Magadia offers documentary evidence that Jackson and Simek faxed Magadia's "unacceptable" performance appraisal to McElroy before McElroy made his hiring

decision. (Pl. Opp'n Ex. G.) Magadia contends that he received the "unacceptable"

performance appraisal a few days after he interviewed for the DAO job, and that the

"evaluation was written with the intent to preclude [him] from being promoted to the

position of [DAO]." (Pl. Opp'n at 6.)

The Government argues that Magadia has offered no evidence that Jackson's

purported negative recommendation was motivated by his race or was retaliatory in

nature.

### b.    SAO

On or about September 27, 2000, Magadia applied for an SAO position at the

NYAO. (McNeela Decl. Ex. B at 221:6-9.) Jackson was the selecting official for the

SAO position (subject to the concurrence of Headquarters). She did not select Magadia

for the position. In fact, he never even received an interview for the position. (Id. at

221:12-14.)

Instead, Jackson selected, Mirash Dedvukaj ("Dedvukaj"), who was an attorney

with prior experience as an Assistant District Attorney. The Government contends that

Jackson hired Dedvukaj because he was the best candidate: his work product was

superior to that of all other applicants, including Magadia. The Government contends

that Jackson's evaluation of Dedvukaj as the best candidate for the job is reflected in his

subsequent performance at USCIS; since being hired as an SAO, Dedvukaj has been

steadily promoted and is now the District Director for the USCIS Office in Detroit,

Michigan.

By contrast, the Government argues that Magadia's missteps with respect to

Shandorf show a lack of judgment, which is an essential quality for an SAO.

Magadia contends that Jackson did not hire him because of his race and in retaliation for (1) his complaints to the FBI and OIG, (2) his filing of a union grievance a little over a year before applying for the SAO position. When he was rejected for the SAO position, Magadia never asked anyone why he was not hired. However, he argues that he "didn't have to ask . . . [because] with everything that was happening I really don't think [Jackson] would have hired me." (Id. at 221:17-25.)

### 5.   Suspension, Abeyance Agreement, and Resignation

In or about March 2001, the Deputy Director of the NYAO at that time, Monica Sanders ("Sanders"), issued a notice of proposed 14-day suspension to Magadia for his failure to follow established procedures by not elevating his disagreement with Shandorf about his assessment of several Albanian asylum applications.

At the NYAO, the Deputy Director, not the Director, has the responsibility to initiate proposals for discipline; the Director *then* makes the final decision whether to impose discipline. Jackson was the Director at the time Sanders recommended Magadia be suspended.

Jackson accepted Sanders' recommendation. Although she did not believe that Magadia had engaged in criminal activities, she believed that he needed to be disciplined for his ethical lapses in failing to use prescribed NYAO procedures to report Shandorf's misconduct. However, Jackson decided to mitigate the proposed 14-day suspension; she offered Magadia the opportunity to avoid suspension altogether by entering into an abeyance agreement.

As initially proposed, the abeyance agreement provided that Magadia could avoid suspension if, among other things, he acknowledged wrongdoing, maintained a clean

16

disciplinary record for one year, and donated 40 hours of annual leave to the Voluntary Leave Transfer Program (which is typically used by ill or convalescing USCIS employees who have exhausted their allotted leave).

Magadia elected to be represented by his union during the disciplinary proceedings,. He did not like various aspects of the proposed abeyance agreement and asked if he could negotiate its terms. Jackson agreed and assigned the task of negotiating the agreement to Simek, who was her advisor on labor-management relations issues.

Between March 2001 and June 2001, Simek, Magadia, and Magadia's union representative met several times in an attempt to negotiate the terms of the abeyance agreement. Several changes were made. The Government contends the changes were made to accommodate Magadia's concerns. Magadia contends that none of the proposed changes benefited him.

In or about early June 2001, Jackson approved what management believed was a final version of the abeyance agreement, thinking that Magadia found it acceptable and would sign it. But he never did. He testified, "During the entire negotiation process . . . I voiced my opinion unequivocally that I disagree with signing this abeyance agreement, unequivocally at every meeting every step of the game in front of my union steward." (Id. at 241: 5-10.) Eventually, Magadia contends that the negotiations reached the point where there was nothing left for him to do but to placate the NYAO and pretend to go along with its proposals; even though he found them unacceptable. (See Compl. ¶ 30; Def. Rule 56.1 ¶ 45.) The plaintiff does not deny that he pretended that the negotiations were fruitful.

17

On the morning of June 7, 2001, instead of signing the abeyance agreement, Magadia slipped a letter of resignation under Simek's door. The letter made his resignation effective immediately. (McNeela Decl. Ex. D.) Magadia provided his employer with no advanced notice of his departure. He left a number of cases unfinished.

Magadia contends that he did not deserve the proposed suspension or offer of the abeyance agreement because he "didn't do anything wrong." (McNeela Decl. Ex. B at 144:19-20.) Rather, he contends he received the notice of suspension and offer of an abeyance agreement based on his race, and in retaliation for the September 19, 1999, grievance he had filed, and for the complaints he had previously made to the FBI, OIG, and OIA during their investigations.

Magadia also contends that Simek threatened him with termination if he did not sign the abeyance agreement. However, Magadia testified that he did not believe that Simek's threat was either serious or motivated by race. He testified that he believed Simek threatened him because Jackson wanted the agreement "signed as soon as possible and [Simek's] way of making me sign [the agreement] [was] to threaten me with termination." (Id. at 240:22-25.)

Magadia argues that the abeyance agreement negotiation process, coupled with all of the other mistreatment he endured after Shandorf's arrest (as described above), left him with no choice but to resign from the NYAO.

### E. Magadia's EEO Complaint and Post-Complaint Retaliation

On or about June 11, 2001, approximately four days after his resignation, Magadia first contacted an EEO counselor to complain of discrimination. He filed a formal complaint of discrimination against the Government on August 3, 2001. Prior to

June 11, 2001, Magadia had never contacted an EEO counselor during his employment at the NYAO.[3]

In his administrative complaint, Magadia alleged that the NYAO discriminated against him based on his ethnicity (Asian/Filipino) by threatening him with suspension—not termination—if he did not sign the abeyance agreement. Magadia also alleged that he was harassed because he received a negative performance appraisal. As a result of the negative appraisal, he alleged that he did not receive promotions to various supervisory positions to which he applied.

Sometime in or about the summer of 2002, Magadia applied for an AO position with the Asylum Office in Arlington, Virginia. The Deciding Official for that position, Martha Belvedere ("Belvedere"), contacted Jackson and Simek to get information about Magadia. Jackson and Simek testified that they did not tell Belvedere not to hire Magadia; however, both testified that they could not affirmatively recommend Magadia, because of his connection to the Shandorf investigation, his failure to follow proper procedures when Shandorf ordered him to alter asylum recommendations, the average

---

[3] Although it took five and one-half years for the plaintiff's claims to reach this Court, his lawsuit is timely (although, as discussed below, most of his claims are not). The plaintiff filed his EEO complaint approximately one month before 9/11, which may explain why his complaint took so long to reach federal court, although that is not entirely clear from the record. In or about January 21, 2003, he received a notice from the Department of Justice that his complaint of discrimination had been accepted for investigation. (McNeela Decl. Ex. R.) Subsequently, pursuant to the Homeland Security Act, the Department of Homeland Security obtained jurisdiction over the investigation of his discrimination complaint. On or about May 5, 2006, the DHS issued a final decision on Magadia's complaint, determining that there was insufficient evidence of discrimination to support his claim. (McNeela Decl. Ex. A.) Magadia received a "Right to Sue Letter" on the same day, and timely brought this action in federal court on December 13, 2006. (Id.)

quality of his work product, and his a lack of dedication to his job, as demonstrated by the fact that he resigned without notice and before he completed assignments.

Belvedere did not hire Magadia because of Simek's and Jackson's' unfavorable references.

Magadia contends that Simek and Jackson retaliated against him by giving him a negative reference, and that Simek, Jackson and Belvedere, "conspired to deny plaintiff access to that position when he was better qualified than the individuals who were ultimately selected." (Compl. ¶ 35.) However, Magadia admits that he does not know the identities of the individuals who were selected for the AO positions by Belvedere, never tried to find out who was hired, and has no knowledge of the racial backgrounds of each successful applicant.

### III.    Standard of Review

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Whether any disputed issue of fact exists is for the Court to determine. Balderman v. United States Veterans Admin., 870 F. 2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing

20

that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The party opposing

summary judgment "may not rely on conclusory allegations or unsubstantiated

speculation."  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  Moreover, not every

disputed factual issue is material in light of the substantive law that governs the case.

"Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude summary judgment."  Anderson, 477 U.S. at 248.  Finally, the

nonmoving party "must do more than simply show that there is some metaphysical doubt

as to the material facts."  Matsushita Elec. Indus. Co., 475 U.S. at 586.  To withstand a

summary judgment motion, sufficient evidence must exist upon which a reasonable jury

could return a verdict for the nonmovant.

## IV.     Timeliness of Plaintiff's Claims

An employee suing the federal government under Title VII must "timely exhaust

the administrative remedies at his disposal" Belgrave v. Pena,  254 F.3d 384, 386 (2d Cir.

2001), before initiating a lawsuit in federal court.

The Equal Employment Opportunity Commission's ("EEOC") administrative

procedures require that the federal employee first "(1) consult with a counselor at the

relevant agency's [EEO] within 45 days of the alleged discriminatory act, and, if the

matter is not resolved after a mandatory counseling period, (2) file a formal written

administrative complaint [i.e., EEO complaint] within 15 days of receipt of the EEO

counselor's notice of final interview and right to file a formal complaint . . . ."  Id. at 386

(2d Cir. 2001) (internal quotations, punctuation and citations omitted).

The 45-day period specified in the EEOC's regulations acts as a statute of

limitations, and "as a general rule, claims alleging conduct that occurred more than 45

days prior to the employee's initiation of administrative review are time-barred."
Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001). But, the statute of limitations
is not an evidentiary bar; "an employee [may use] the prior acts as background evidence
in support of a timely claim." Nat'l R. R. Passenger Corp. v. Morgan, 536 U.S. 101, 113
(2002).

The 45-day rule is not absolute. One exception to the rule is known as the
continuing violation doctrine. Under this doctrine, "if a plaintiff has experienced a
continuous practice and policy of discrimination . . . the commencement of the statute of
limitations period may be delayed until the last discriminatory act in furtherance of it."
Id. at 359 (quotation, punctuation, and citation omitted). The continuing violation
doctrine provides that if a plaintiff files a single timely charge of discrimination "as to
any incident of discrimination in furtherance of an ongoing policy of discrimination, all
claims of acts of discrimination under that policy will be timely even if they would be
untimely standing alone." Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993).

"However, multiple incidents of discrimination, even similar ones, that are not the
result of a discriminatory policy or mechanism do not amount to a continuing violation."
Id. The Supreme Court has held that the continuing violation doctrine does not apply to
discrete and easily identifiable acts of discrimination. Morgan, 536 U.S. at 114.
"Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire
are easy to identify. Each incident of discrimination and each retaliatory adverse
employment decision constitutes a separate actionable unlawful employment practice"
id., which means that a claim based on each discrete act is timely only if the plaintiff
complained of the act within 45 days after it occurred. Id.

By contrast, claims for a hostile work environment, are "treated essentially as a continuing violation," Sundaram v. Brookhaven Nat. Laboratories, 424 F. Supp. 2d 545, 560 (E.D.N.Y. 2006) (citing Elmenayer v. ABF Freight Sys., Inc., 318 F.3d 130, 134 (2nd Cir.2003)), because "a hostile work environment claim . . . is 'comprised of a series of separate acts that collectively constitute one unlawful employment practice.'" Elmenayer, 318 F.3d at 134 (quoting Morgan, 536 U.S. at 117).

The vast majority of Magadia's complaints are clearly time barred.

Magadia first made contact with an EEO counselor on June 11, 2001. 45 days prior to this date is April 26, 2001. The Government argues that, as a consequence, any of Magadia's claims based on acts prior to April 26, 2001, are untimely. Magadia counters that, because he was constructively discharged (i.e., forced to resign) on June 7, 2001, his "action was filed timely." (Pl. Opp'n at 12.)

It is true that Magadia's constructive discharge claim is timely. However, the majority of his claims (with the exception of hostile work environment, which is discussed below) are not. The plaintiff cannot recover for any of the following allegedly discriminatory acts: 1) Simek's purported accusations of disloyalty in the months immediately following Shandorf's April 8, 1999 arrest, and Jackson's similar comments during an April 2, 2001 meeting; 2) Magadia's denial of computer access beginning on or about July 13, 1999; 3) Magadia's temporary assignment to the APSO program some time in 2000; 4) Magadia's receipt of the August 19, 1999 negative performance appraisal; 5) the delay in processing Magadia's within-grade step pay increase a few months after December 1999; 6) the rejection of Magadia's application for the DAO

position on October 20, 1999; and 7) the rejection of Magadia's application for the SAO position on September 27, 2000.

As a result, Magadia has two viable "discrete act" claims remaining: his proposed suspension in June 2001 ("Suspension") and the negative recommendation he received when he applied for a job in Virginia in 2002 ("2002 application"). He also brings claims for a hostile work environment claim and constructive discharge, and acts that occurred prior to April 26, 2001 may be considered as evidence in assessing whether he is entitled to relief on those claims. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Morgan, 536 U.S. at 117.

Finally, Magadia does not even mention the continuing violation doctrine in his motion papers. Even if he had, it would avail him nothing, because the acts about which Magadia complains were all "discrete acts" that were easily identifiable as discriminatory at the time that they were made. For example, Magadia received a negative performance appraisal on August 19, 1999. The appraisal is a discrete act; if Magadia thought it was the product of discrimination or retaliation he could have complained within 45 days. Magadia chose not to do so. His opportunity to contest the appraisal has long since expired. This reasoning is equally true for all other claims Magadia brings based on events prior to April 26, 2001.

Case 1:06-cv-14386-CM-MHD Document 28 Filed 02/26/09 Page 25 of 36

## V.    Employment Discrimination Claims

### A.    Discrimination

In discrimination cases, the plaintiff bears the burden of introducing evidence that would, if credited, establish every element of his *prima facie* case. The plaintiff must show "1) that be belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination." Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004). If the plaintiff meets that minimal burden, the defendant must come forward with a legitimate non-discriminatory reason for taking the action it took. At that point, the burden shifts back to the plaintiff to prove, with evidence and not conclusory supposition, that the defendant's articulated rationale is a pretext for discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 806 (1973). The plaintiff, with admissible evidence, "must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Feingold, 366 F.3d at 152.

The parties do not dispute that Magadia's evidence satisfies the first three elements of a *prima facie* case for discrimination. However, they dispute whether Magadia has offered sufficient evidence to warrant an inference of discrimination.

The Government contends that Magadia has not offered any evidence to show that any of the conduct about which he complains gives rise to an inference of discrimination.

Magadia responds by arguing that, "while, on its face, it may not appear to be blatant racial discrimination, NYAO's track records show they have done this before to

other employees of color, also forcing them to leave NYAO to obtain their promotion at another office within the former INS." (Pl. Opp'n at 18.) Magadia contends that it follows that the Government's actions in this case must have been discriminatory.

To support this argument, Magadia relies on the affidavit of Van Gronigen, a former AO at NYAO from July 22, 1996 to January 2000, who attested that, "NYAO's Management has had a reputation for wrongly accusing its 'persons of color' employees for minor infractions, forcing them to resign or transfer to other branches within INS." (Pl. Opp'n Ex. A. ¶ 10.) Van Gronigen's statement does not claim Jackson or Simek discriminated against "persons of color." She does not claim that she saw anyone discriminate against Magadia, nor does she assert that she believes he was discriminated against. She also does not identify a single example of an employee of color who was treated differently than a white employee. She simply asserts, in conclusory fashion, that it is true.

Magadia also contends that a triable issue of fact exists because the only supervisor to give him a negative appraisal was Simek. Magadia contends that, because his prior supervisors did not find any problems with his work, Simek's evaluation must have been motivated by race.

Magadia has no evidence tending to show that *anything* that happened during his tenure in the NYAO was motivated by race. (See e.g., Def. Mem. at 22-25 (quoting Magadia's testimony about each claim where he admits that he has no evidence that race motivated Simek's and Jackson's actions).) His reasoning is on the order of: (1) something bad happened to him; (2) he is Filipino; (3) therefore the bad thing happened because he is Filipino. That fails to make out a *prima facie* case of discrimination.

For a trier of fact to be able to infer discrimination, the plaintiff must point to

some *facts* that suggest the actions taken were motivated, at least in part, by racial

animus. Such facts include:

> (1) actions or remarks made by decisionmakers that could be viewed as
> reflecting discriminatory animus; or (2) preferential treatment given to
> employees outside the protected class; or (3) in a corporate downsizing,
> the systematic transfer of a discharged employee's duties to other
> employees; or (4) a pattern of recommending the plaintiff for positions for
> which he is not qualified and not recommending him for positions for
> which he is qualified; or (5) the fact that following plaintiff's termination,
> defendant continued to seek applicants to fill the position.

Kalsi v. New York City Transit Authority, 62 F. Supp. 2d 745, 753 (E.D.N.Y. 1998)

aff'd, 189 F.3d 461 (2d Cir. 1999). While there is no rigid rule for what type of proof is

required to show an inference of discrimination—and the plaintiff's burden of proof is

quite low at the *prima facie* stage—he has to come forward with something. On the

record before me, Magadia has not offered any evidence tending to give rise to an

inference of racial discrimination. See e.g., Robinson v. Am. Stock Exch. LLC, 04 civ.

5899, 2007 WL 3084970 at *6 (S.D.N.Y. Oct. 22, 2007).

In Robinson, the court granted the defendant's motion for summary judgment on

the plaintiff's claim of discrimination. The plaintiff's evidence consisted of his

subjective belief that his supervisor discriminated against him, and the fact that his

supervisor reprimanded him after the plaintiff (Black) had a dispute with another white

employee. The court held that, in the absence of any other evidence, racial

discrimination could not be inferred from the underlying facts. Id. at 7.

Here, nothing in the record suggests that the Government discriminated against

Magadia because he is an Asian-American. The totality of Magadia's "evidence"

consists of conclusory allegations, conjecture, and speculation. The fact that Simek was

the first of Magadia's supervisors to criticize his work is not only devoid of racism, it is completely understandable: prior to Simek, the plaintiff's supervisor was a criminal who had no incentive to criticize an employee who was obedient to his wishes and who assisted (albeit unwittingly) in the consummation of his criminal activity. This does not defeat a motion for summary judgment.

Accordingly, the Government's motion for summary judgment dismissing the plaintiff's claims of race discrimination is granted.

## B. Retaliation

To establish a *prima facie* case of retaliation, a plaintiff must show that: 1) he was engaged in a protected activity; 2) his employer was aware of that activity; 3) he suffered a materially adverse action; and 4) there was a causal connection between the protected activity and the adverse employment action. See Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). If the plaintiff meets this burden, the McDonnell-Douglas burden-shifting analysis used in claims of discrimination—articulated above—also applies to retaliation claims. Bush v. Fordham Univ., 452 F. Supp. 2d 394, 415 (S.D.N.Y. 2006) (citing Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003)).

Only three possible actions taken by Magadia could be considered protected activities: 1) his complaints about Jackson and Simek to the FBI and OIG, which took place some time in 1999 or 2000; 2) his September 15, 1999 union grievance; and 3) his August 3, 2001 EEO complaint. All occurred (if indeed the first occurred) far too long ago before the acts of June 2001 and November or December 2002 to give rise to a plausible inference of retaliation.

A plaintiff may establish a causal connection between the protected activity and the adverse employment action through direct evidence of retaliatory animus or indirectly with circumstantial evidence, "for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct . . . ." Sumner v. U.S. Postal Service, 899 F.2d 203, 209 (2d Cir. 1990); see also Daly v. Presbyterian Hosp., 98 civ. 4253, 2000 WL 8268, at *5 (S.D.N.Y. Jan. 4, 2000). Indirect proof of a causal connection may also be shown by temporal proximity. "A closeness in time between the protected act and the alleged retaliation supports an inference of discrimination sufficient to establish a prima facie case." Id. at *6 (citations and quotation omitted).

Magadia does not offer direct evidence of retaliation—he admits he has none. The only "evidence" that he offers to support causality is that the purported adverse actions (Suspension and 2002 application) happened after he filed his grievance. Unfortunately for the plaintiff, the Supreme Court has held that to establish causality based on timing requires the temporal proximity be "very close." Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001). For example, the Court noted that actions taken 20 months or later "suggest[], by itself, no causality at all." Id. at 274.

In this case, Magadia does not know when he complained to the FBI or OIG about his suspension. He admits he has no proof that he made such complaints and does not recall the substance of them. Nor does he offer any evidence that he communicated the fact of his complaints to Jackson and Simek. Accordingly, Magadia fails to establish two elements of a *prima facie* case for retaliation: 1) that his employer was aware of the activity; and 2) causality.

For the other two activities, Magadia has not shown causality based on temporal proximity. He filed the union grievance on August 19, 1999, but disciplinary proceedings were not initiated against him until March 2001,[4] approximately 19 months later, and he was rejected for the AO position in or about November or December 2002, approximately 38 months after he filed the grievance. Since there is a total absence of other direct or indirect evidence of retaliation, the substantial gaps in time between his protected activities and the adverse actions he suffered are too great to support an inference of causality.

Similarly, Magadia fails to establish a causal connection between the EEO complaint and the decision not to hire him for the AO position in 2002. Over a year in time lapsed between when Magadia filed the complaint and when he received notice of rejection for the position. This gap in time—without more—is too great to establish the necessary nexus.

Accordingly, the Government's motion for summary judgment on the retaliation claim is granted.

## C.    Hostile Work Environment

Title VII provides that "It shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a). The phrase "terms, conditions, or privileges of employment" is broad enough to render actionable an employer's requirement that an employee work in a discriminatory, hostile or abusive

---

[4] Although the notice of the propose suspension is outside the period of timeliness, plaintiff's claim based on the suspension and abeyance agreement is not.

environment. <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 66 (1986); <u>Gregory v. Daly</u>, 243 F.3d 687, 691 (2d. Cir. 2001). In order to prevail on a hostile work environment claim, a plaintiff must establish two elements: 1) a hostile work environment; and 2) a specific basis for imputing the conduct that created the hostile environment to the employer. <u>See Distasio v. Perkin Elmer Corp.</u>, 157 F.3d 55, 62 (2d. Cir. 1998); <u>Gallagher v. Delaney</u>, 139 F.3d 338, 347-48 (2d. Cir. 1998).

With respect to the first element, the plaintiff must show that his workplace was "'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Oncale v. Sundowner Offshore Servs. Inc.</u>, 523 U.S. 75, 78, (1998) (<u>quoting Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)). The test has both an objective and subjective component: "A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." <u>Mormol v. Costco Wholesale Corp.</u>, 364 F.3d 54, 58 (2d Cir. 2004) (<u>quoting Brennan v. Metro. Opera Ass'n</u>, 192 F.3d 310, 318 (2d Cir. 1999)). Moreover, the conduct of which plaintiff complains "must be sufficiently continuous and concerted in order to be deemed pervasive." <u>Feingold</u>, 366 F.3d at 150. "Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support" a hostile work environment claim. <u>Petrosino v. Bell Atlantic</u>, 385 F.3d 210, 223 (2d Cir. 2004).

In determining whether the alleged harassment is of "such quality or quantity" as to meet the "severe and pervasive" standard, courts consider the totality of the circumstances, including such factors as the frequency of the conduct, its severity,

whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and whether the conduct unreasonably interferes with the employee's work performance. Harris, 510 U.S. at 23; see also Williams v. County of Westchester, 171 F.3d 98, 100 (2d Cir. 1999) (per curiam). Finally, while the harassment complained of need not exhibit explicit racial animus in order to be actionable under Title VII, the plaintiff is required to establish that the conduct was based on his race. Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002) ("Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.").

The plaintiff is also required to show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." Howley v. Town of Stratford, 217 F.3d 141, 153-54 (2d. Cir. 2000). Where, as here, the actionable hostile environment is created by a supervisor with immediate (or successively higher) authority over the employee, the employer is vicariously liable for the wrongful conduct. See Faragher v. City of Boca Raton, 524, U.S. 775, 807 (1998); Burlington Indus., 524 U.S. at 765. However, when no tangible employment action is taken against the employee, the employer may establish an affirmative defense to liability or damages by showing that (a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Id.

32

Magadia falls far short of making out a *prima facie* case of hostile work environment. In fact, he offers no evidence that he was harassed at all—no evidence of intimidation, ridicule, or insult, let alone severe or pervasive intimidation, ridicule, or insult. Rather, he is complaining about discrete, adverse employment decisions concerning promotions, discipline, and appraisal, and about employer criticism. Hostile work environment is not a vehicle for resurrecting time-barred claims of discrimination and retaliation; it is a wholly separate cause of action designed to address *other types of work* place behavior, like constant jokes and ridicule or physical intimidation. The plaintiff cannot piggyback the discrete adverse acts about which he complains onto hostile work environment in order to make them actionable.

Furthermore, Title VII is not a "general civility code" (as Justice Scalia famously said), Oncale, 523 U.S. at 80, so even if there were some evidence of behavior that qualifies as harassment, not all harassment or hostile behavior is actionable under Title VII. Only hostile and harassing behavior that is motivated by race, or ethnicity, or sex, or national origin, or religion, or race, or age is actionable. The record before me contains not a scintilla of evidence of anti-Asian or anti-Filipino behavior.

Accordingly, the plaintiff fails to make out a claim for hostile work environment.

### D.    Constructive Termination

"An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." Petrosino, 385 F.3d at 229. Like other claims of discrimination, "the plaintiff must present proof that her discharge occurred in circumstances giving rise to an inference of discrimination on the basis of her

33

membership in that class." Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996). To establish a constructive discharge claim, courts focus on two parts of the standard: 1) the employer's intentional conduct; and 2) the intolerability of the working conditions. Id.

The intent requirement does not require a plaintiff to demonstrate specific intent. See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 74 (2d Cir. 2000). If a plaintiff cannot show specific intent, "he or she must at least demonstrate that the employer's actions were 'deliberate' and not merely 'negligent or ineffective.'" Petrosino, 385 F.3d at 229-30 (quoting Whidbee, 223 F.3d at 74).

The intolerability of an employee's work conditions is evaluated "objectively by reference to a reasonable person in the employee's position." Id. at 230. There must be evidence sufficient for a trier of fact to find that the working conditions "were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Spence v. Maryland Cas. Co., 995 F.3d 1147, 1156 (2d Cir. 1993) (quotation omitted). A plaintiff does not satisfy this evidentiary burden with evidence that employee merely found his working conditions difficult or unpleasant, or that the employee did not receive a raise, did not agree with criticisms of his performance, or preferred working somewhere else. See id.

Magadia contends that Jackson deliberately took advantage of the Shandorf incident to, in effect, force him to resign. He argues that 1) the accusations of disloyalty; 2) being denied computer access; 3) being temporarily assigned to APSO; 4) being denied promotions; 5) receiving a negative performance appraisal; and 6) being offered

an abeyance agreement show that his working conditions at NYAO were so difficult that he had no choice but to resign.

Magadia's argument is unpersuasive.

Most of the events about which he complains were long over by the time the plaintiff resigned. The undisputed evidence demonstrates that Magadia was denied computer access and was temporarily assigned to APSO as a direct result of the post-arrest investigation. Once the investigation was over, Magadia resumed his normal duties, and had his computer access restored. This occurred some time during 2000; he did not resign until 2001.

The NYAO was considering discipline in the form of an abeyance agreement, because Magadia had refused to follow Simek's direction to take his concerns about Shandorf to higher-ups, but the plaintiff's disagreement with that decision did not render his day-to-day working conditions intolerable. Receiving a negative performance appraisal and being denied promotions are unpleasant, but they do not make one's life in the workplace so intolerable as to force one to leave. The only conclusion that a reasonable trier of fact could reach on this record is that Magadia decided he did not want to work in the NYAO any longer and made a strictly voluntary decision to resign.

Accordingly, no rational trier of fact could conclude that Magadia was constructively discharged.

## Conclusion

For the reasons stated above, the Government's motion for summary judgment is granted.

This constitutes the decision and order of the Court.

Dated: February 26, 2009

_____
U.S.D.J.